Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1366 | **DATE** | 5/11/2000 |
| **CASE TITLE** | In Re: RealNetworks, Inc., Privacy Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** The Court rejects Intervenor's additional arguments in support of Plaintiffs' opposition to arbitration.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | MAY 12 2000 date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| SCT | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number: 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE REALNETWORKS, INC., )
PRIVACY LITIGATION ) 00 C 1366
)

CHARLES P. KOCORAS, District Judge:

Before the Court is Intervenor David Keel's additional arguments in support of Plaintiffs' opposition to arbitration. For the reasons set forth below, the Court rejects Intervenor's additional arguments.

DOCKETED
MAY 12 2000

## BACKGROUND

Plaintiffs Michael Lieschke, Robert Jackson, and Todd Simon (collectively, the "Plaintiffs"), both on behalf of a class of Illinois plaintiffs and individually, brought suit against Defendant RealNetworks, Inc. ("RealNetworks") under federal and common law. Plaintiffs allege trespass to property and privacy, claiming that RealNetworks' software products secretly allowed RealNetworks to access and intercept users' electronic communications and stored information without their knowledge or consent. Previously, this Court considered and granted RealNetworks' motion to stay this matter and enforce arbitration, finding that the End User License Agreement (the "License Agreement") required arbitration of this dispute. See Lieschke v. RealNetworks, Inc., No. 99C 7274, 99 C 7380, 2000 WL

198424 (N.D. Ill. Feb. 11, 2000). Subsequently, this Court allowed Intervenor David Keel (the "Intervenor") to file his additional arguments in support of Plaintiffs' opposition to arbitration in order to raise certain arguments not presented to the Court when it decided the arbitration issue. It is these arguments that the Court presently addresses.

RealNetworks offers free basic versions of two products, RealPlayer and RealJukebox, for users to download from RealNetworks' site on the World-Wide Web. These products allow users to see and hear audio and video available on the Internet and to download, record, and play music.

Before a user can install either of these software packages, they must accept the terms of RealNetworks' License Agreement, which appear on the user's screen. Paragraph 10 of the Agreement includes the following clause:

> This License Agreement shall be governed by the laws of the State of Washington, without regard to conflicts of law provisions, and you hereby consent to the exclusive jurisdiction of the state and federal courts sitting in the State of Washington. Any and all unresolved disputes arising under this License Agreement shall be submitted to arbitration in the State of Washington.

Defendant cites this clause as binding authority for its assertions that arbitration is required. Intervenor, on the other hand, argues that this clause does not operate to require arbitration for several reasons. First, Intervenor contends that the License

Agreement, including the arbitration requirement, does not constitute a "writing." Second, Intervenor claims that Ninth Circuit decisional law controls the construction of the arbitration provision and dictates that the arbitration clause be read narrowly to preclude enforcement in this action. Finally, Intervenor argues that the arbitration provision is unenforceable because it is unconscionable.

## DISCUSSION

Although national policy encourages arbitration of disputes, submission to arbitration is consensual, not coercive. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 62, 115 S.Ct. 1212, 1216, 1218, 131 L.Ed.2d 76 (1995). Thus, a court cannot force a party to arbitrate unless that party has entered into a contractual agreement to do so. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); AT&T Technologies v. Communications Workers of America, 475 U.S. 643 648 (1986). In order to determine whether the parties intended to submit to arbitration, a court reviews the contract at issue. See AT&T Technologies, 475 U.S. at 648. In so doing, a court employs the standard methods of contract interpretation, using state-law principles. See Mastrobuono, 514 U.S. at 54; Perry v. Thomas, 482 U.S. 483, 492 (1987);

First Options of Chicago, 514 U.S. at 944. Ambiguities, however, are resolved in favor of arbitration. See Mastrobuono, 514 U.S. at 62.

A party contesting the submission of the claim to arbitration must clearly show that the presumption of arbitrability does not apply. See Int'l Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp., 13 F.3d 253, 255-56 (7th Cir. 1994). A claim will be deemed to be arbitrable if an arbitration clause is capable of any interpretation that a claim is covered. See id. If parties have a contract providing for arbitration of some issues, questions concerning the scope of issues subject to arbitration should be resolved in favor of arbitration. See Miller v. Flume, 139 F.3d 1130, 1136 (7th Cir. 1998).

## I. Writing Requirement

Intervenor claims that the License Agreement, including the arbitration provision, does not constitute a writing as required by the Federal Arbitration Act (the "FAA") and the Washington Arbitration Act (the "WAA") in order to be enforced. According to Intervenor, the License Agreement is an electronic agreement, and electronic agreements do not satisfy the "written" agreement provisions of the FAA and the WAA. Moreover, Intervenor asserts that even if some electronic agreements are acceptable, RealNetworks' electronic agreement is

not because a user cannot print or save it. RealNetworks does not dispute that the arbitration provision must be written in order to be enforceable. Rather, RealNetworks argues that its License Agreement, including the arbitration provision, constitute a writing and that it may be printed and saved.

Both the Intervenor and RealNetworks agree that Congress intended the FAA to apply only to written contracts. Because the terms in the statute must be given their plain meaning and do not explicitly allow for an "electronic" agreement, Intervenor reasons that an electronic communication cannot satisfy the writing requirement, but only a written one can. However, this only begs the question, what is a written agreement? Although contract terms must be given their plain and ordinary meaning, the Court is unconvinced that the plain and ordinary meaning of "writing" or "written" necessarily cannot include any electronic writings. See Williams v. Taylor, 120 S.Ct. 1479, 1488 (2000) (words will be interpreted as taking their ordinary, contemporary, common meaning).

Courts frequently look to dictionaries in order determine the plain meaning of words and particularly examine how a word was defined at the time the statute was drafted and enacted. The FAA was enacted in 1925. See Cortez Byrd Chips, Inc. v. Bill Harbert Construction Co., 120 S.Ct. 1331, 1333 (2000). As now, words

had several different definitions. In relevant part, at the time, Webster's Dictionary defined "writing" as:

> 1. The act or art of forming letters or characters on paper, wood, stone, or other material, for the purpose of recording the ideas which characters and words express, or of communicating them to others by visible signs. 2. Anything written or printed; anything expressed in characters or letters. See WEBSTER'S DICTIONARY (1913).

Webster's defined "written" as the participle of write, which it defined as:

> 1. To set down, as legible characters; to form the conveyance of meaning; to inscribe on any material by a suitable instrument; as, to write the characters called letters; to write figures. See id.

A legal dictionary at the time provided that "The word 'written,' used in a statute, may include printing and any other mode of representing words and letters." See Pope, Benjamin, W., Legal Definitions, Callaghan and Co. (1920). Thus, although the definition of a writing included a traditional paper document, it did not exclude representations of language on other media. Because electronic communications can be letters or characters formed on the screen to record or communicate ideas be visible signs and can be legible characters that represent words and letters as well as form the conveyance of meaning, it would seem that the plain meaning of the word "written" does not exclude all electronic communications. That being said, the Court does not now find that all electronic communications may

be considered "written." Rather, the Court examines the contract at issue in this action and finds that its easily printable and storable nature is sufficient to render it "written."

The Court rejects Intervenor's contention that the License Agreement is not printable and storable. Intervenor asserts that RealNetworks affirmatively inhibits users from printing or storing the License Agreement by failing to provide a conspicuous "print" or "save" button on the pop-up License Agreement window. However, Intervenor is incorrect in its assertions because the License Agreement may rather easily be printed and is automatically stored on the user's hard drive despite the absence of the "print" and "save" buttons. In fact, there exists more than one way to print the License Agreement. First, before the user has even accepted the License Agreement, the user can right click his mouse over the text of the License Agreement, select all, and copy and paste it onto any word processing program. Since using the right click function is too specialized for Intervenor, he even has the option to simply click and drag the cursor over the text of the License Agreement in order to highlight it and then copy and paste the License Agreement onto any word processing program. Moreover, users have yet another way of printing the License Agreement. After a user accepts the License Agreement, it is

automatically downloaded and saved to the user's hard drive. The user can then click on the License Agreement, listed separately as either "RealJukeBox License Agreement" or "RealPlayer License Agreement," depending on the product, and easily print out either agreement from the file pull down menu. Thus, Intervenor's assertion that the License Agreement cannot be saved, retrieved, or printed is incorrect. Moreover, once installed, the License Agreement is not hidden, as Intervenor claims, but is listed as prominent and separate icons under "Real" on the "Start" menu. Although any computer use can be intimidating, the process of printing the License Agreement is no more difficult or esoteric than many other basic computer functions, and the melodrama and over exaggeration with which Intervenor describes the alleged impossibility of printing the License Agreement is disingenuous.

Finally, Intervenor points to Congress' present day discussions about electronic communications in arguing that the FAA's and WAA's writing requirement cannot be satisfied by an electronic communication. However, the modern congressional discussions that Intervenor points to do not serve as evidence of Congress' intent when it enacted the FAA in 1925. That Congress may now, with some hindsight on the advance of electronic communication, explicitly provide

for written and electronic agreements in new legislation, does not mean that Congress in 1925 excluded electronic communications from the category of written communications by not explicitly providing for it. Rather, "New words may be designed to fortify the current rule with a more precise text that curtails uncertainty." See ProCD, Inc. v. Zeiderberg, 86 F.3d 1447, 1452 (7th Cir. 1996). Modern Congress' discussions indicate that it was, in fact, the "uncertain" legal effect of an electronic record or an electronic signature that prompted Congress to consider the "Electronic Signatures in Global and National Commerce Act," to which Intervenor cites. See House Report No. 106-341(I), September 27, 1999. Moreover, it seems that the License Agreement would, nevertheless, constitute a writing even for purposes of Congress' discussions today because the License Agreement may be printed and stored. See 145 Cong. Rec. S14881-01, at *S14884, November 19, 1999.

Thus, the License Agreement, including the arbitration provision, is a written agreement.

## II. Ninth Circuit v. Seventh Circuit

Intervenor suggests that this Court must apply Ninth Circuit decisional law, which construes arbitration clauses more narrowly than the Seventh Circuit, which

favors a liberal interpretation. The License Agreement has an express choice of law provision designating Washington law as governing the License Agreement. Thus, where application of state or common law is necessary, a court applies Washington law. However, Intervenor asserts that the License Agreement expressly designates the application of Ninth Circuit decisional law to the License Agreement as well. The Court does not agree.

With respect to state or common law issues, the Court applies Washington law. A federal court applies the choice of law rules of the forum state to determine which state's substantive law governs the case. See Serfecz v. Jewel Food Stores, Inc., No. 92 C 4171, 1997 WL 543116, at *6 (N.D. Ill. Sept. 2, 1997); Lachmund v. ADM Investor Servs., Inc., No. 96 C 4143, 1997 WL 43214, at *4, n.2 (N.D. Ill. Jan. 28, 1997). Thus, the Court applies Illinois choice of law rules. Illinois choice of law rules provide that an express choice of law contract provision will be given effect as long as it does not contravene Illinois public policy and the state chosen bears a reasonable relationship to the parties or the transaction. See Paul Davis Systems of Northern Illinois, Inc. v. Paul W. Davis Systems, Inc., No. 98 C 2027, 1998 WL 749041, at *3 (N.D. Ill. Oct. 15, 1998), citing Potomac Leasing Co. v. Chuck's Pub, Inc., 156 Ill. App. 3d 755, 109 Ill. Dec. 90, 509 N.E.2d 751, 753-54 (Ill. App. Ct. 1987). Thus, because neither party suggests that Washington

law would contravene Illinois public policy or that Washington does not bear a reasonable relationship to the parties or the transaction, the Court applies Washington law to the state and common law claims as agreed to in the parties' License Agreement. Cf. Paul Davis Systems, 1998 WL 749041, at *3.

However, the same is not true for Ninth Circuit decisional law. The License Agreement provides that "you hereby consent to the exclusive jurisdiction of the state and federal courts sitting in the State of Washington." From this, Intervenor asserts that the License Agreement explicitly provides for application of Ninth Circuit decisional law. However, this provision is not an express choice of law provision, but rather it is a forum selection clause,[1] which is presently not before the Court. Because the selection of a forum does not operate as a choice of law clause, the Court will not imply a choice of law provision where the parties did not expressly agree to it. See Maljack Productions, Inc. v. Survival Anglia Ltd., No. 97 C 789, 1999 WL 182154 (N.D. Ill. Mar. 24, 1999) (choice of law provisions are not equivalent to forum selection clauses). Because there exists no express choice

---

[1] The forum selection clause in the License Agreement also includes arbitration in Washington state as a forum. The License Agreement provides, "Any and all unresolved disputed arising under this License Agreement shall be submitted to arbitration in the State of Washington.

of law provision selecting Ninth Circuit decisional law as governing the License Agreement, Seventh Circuit law binds this Court.

Thus, the Court reiterates its finding of arbitrability of this dispute under Seventh Circuit law as laid out in its previous decision, Lieschke v. RealNetworks, Inc., 2000 WL 198424.

### III. Unconscionability

Finally, Intervenor claims that the arbitration agreement is unenforceable because it is both procedurally and substantively unconscionable. Procedural unconscionability involves impropriety during the process of forming a contract, whereas substantive unconscionability pertains to those cases where a clause or term in a contract is allegedly one-sided or overly harsh. See Public Employees Mutual Ins. Co. v. Hertz Corp., 59 Wash. App. 641, 645-46, 800 P.2d 831, 833 (1990).

Intervenor argues that the License Agreement is procedurally unconscionable because it failed to provide fair notice of its contents and did not provide a reasonable opportunity to understand its terms before it was enforced. Both of these assertions are incorrect. Intervenor claims that the arbitration provision does not provide fair notice because it is "buried" in the License Agreement. Although burying important terms in a "maze of fine print" may contribute to a contract being found unconscionable, the arbitration provision in the License Agreement is not

buried. But see Public Employees Mutual Ins., 59 Wash. App. At 648, 800 P.2d at 834 (it is not law of Washington that presence of small print in context of standard form agreement necessarily leads to a finding of unconscionability). The License Agreement sets out the arbitration provision in the same size font as the rest of the agreement. Cf. id. at 650, 800 P.2d at 836. Moreover, it is not buried in the middle of the entire agreement or located in a footnote or appendix, but rather comprises the attention-getting final provision of the agreement. Although RealNetworks could have titled the heading containing the arbitration clause, the choice of law provision, and the forum selection clause in a more descriptive manner than "Miscellaneous," RealNetworks' titling it such does not necessarily bury the provision. While RealNetworks did not set off the arbitration provision and purposely draw attention to it, neither did RealNetworks bury the provision in a sea of words. Although burying an arbitration clause could contribute to a finding of unconscionability, the Court is unaware of, and Intervenor has not pointed to, any Washington state caselaw that provides that an arbitration clause is unconscionable if the contract does not draw attention to it.

Moreover, Intervenor claims that the user is not given a reasonable opportunity to understand the arbitration provision because the License Agreement comes in a small pop-up window, which is visually difficult to read, and because it

cannot be printed. The Court has already discussed at length the capability of printing the License Agreement, and again rejects Intervenor's contention that the License Agreement cannot be printed. The Court also finds that the size of the pop-up window, although smaller than the desktop, does not make the License Agreement visually difficult to read. The Court finds disingenuous Intervenor's assertion that the License Agreement appears "in very fine print, requiring the user to position himself just inches from the monitor in order to read it." The font size of the License Agreement is no smaller, and possibly larger, than the font size of all the words appearing on the computer's own display. If Intervenor needs to plaster his face against the screen to read the License Agreement, he must then have to do the same to read anything on his computer, in which case, doing so does not seem like an inordinate hardship or an adjustment out of the ordinary for him. In addition, the user has all day to review the License Agreement on the screen. The pop-up window containing the License Agreement does not disappear after a certain time period; so, the user can scroll through it and examine it to his heart's content.

Because the arbitration agreement is not buried in fine print and because a user is given ample opportunity to understand the arbitration provision, the Court does not find that the arbitration agreement is procedurally unconscionable.

In addition, Intervenor asserts that the arbitration provision is substantively unconscionable because it chooses a geographically distant forum, it fails to provide for classwide arbitration, and the costs of arbitration are prohibitive.

The Court rejects Intervenor's claim that choosing Washington state as the arbitration forum renders the arbitration agreement substantively unconscionable. The designation of any state as a forum is bound to be distant to some potential litigants of a corporation that has a nationwide reach. Intervenor would have the Court essentially preclude arbitration agreements from having any forum selection clause in order to prevent the designation of a distant forum to any of these litigants. This Court is not willing to do so. Arbitration provisions containing forum selection clauses have previously been upheld. See Quist v. Empire Funding Corp., No. 98 C 8402, 1999 WL 982953, at *3 (N.D. Ill. Oct. 22, 1999) (enforcing contract of Illinois resident that required arbitration in Texas); Doctor's Ass'n, Inc. v. Hamilton, 150 F.3d 157, 163 (2d Cir. 1998) (upholding forum selection clause in arbitration clause designating Connecticut as forum). Moreover, some courts have even found that the forum non conveniens doctrine is inapplicable in the context of arbitrations covered under the FAA. See Al-Salamah Arabian Agencies Co., Ltd. v. Reece, 673 F. Supp. 748, 751 (M.D.N.C. 1987); Spring Hope Rockwool v. Industrial Clean Air, Inc., 504 F. Supp. 1385, 1389 (E.D.N.C. 1981). Thus, that

Washington is a distant arbitration forum for some does not render the arbitration clause substantively unconscionable.

Intervenor also claims that because litigants cannot pursue classwide arbitration without an arbitration provision providing for it, see Champ v. Siegel Trading Co., 55 F.3d 269, 275 (7th Cir. 1995), RealNetworks is effectively preventing potential litigants from seeking classwide arbitration by not expressly providing for classwide arbitration. Further, Intervenor reasons that because consumers in cases such as this have relatively small claims, these consumers' rights to bring a case would essentially be vitiated because the costs of the litigation would be so prohibitive. This Court previously rejected this argument in its prior decision. See Lieschke, 2000 WL 198424, at *3. The Seventh Circuit, along with other courts in this district, have considered this issue and upheld arbitration agreements that do not provide for class action and have even upheld arbitration agreements that expressly prohibit class actions. See Champ, 55 F.3d at 275-77; Zawikowski v. Beneficial Nat'l Bank, No. 98 C 2178, 1999 WL 35304, at *2 (N.D. Ill. Jan. 11, 1999); see also Lopez v. Plaza Fin. Co., No. 95 C 7567, 1996 WL 210073, at *3 (N.D. Ill. Apr. 25, 1996); cf. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985) (the FAA requires district courts to compel arbitration "even where the result would be the possibly inefficient maintenance of separate proceedings in

different forums"). Thus, the Court will not find the License Agreement substantively unconscionable because it does not provide for class arbitration.

Further, the Court rejects Intervenor's argument that allegedly prohibitive arbitration costs render the License Agreement unconscionable. The Seventh Circuit has found that the costs of arbitration do not prevent the enforcement of a valid arbitration agreement. See Hill, 105 F.3d at 1151 (whatever may be said pro and con about the cost and efficacy of arbitration is for Congress and the contracting parties to consider); Dorsey v. H.C.P. Sales, Inc., 46 F. Supp.2d 804, 807 (N.D. Ill. 1999); see also Koveleskie, 167 F.3d at 366 (expensive fees do not necessarily preclude arbitration). As such, the potential arbitration costs do not render the arbitration clause substantively unconscionable.

## CONCLUSION

For the reasons set forth above, the Court rejects Intervenor's additional arguments in support of Plaintiffs' opposition to arbitration.

                                                          Charles P. Kocoras
                                                         United States District Court Judge

Dated: May 11, 2000